J-S46002-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3674 EDA 2018 |

Appeal from the Order Entered November 15, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0002529-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: S.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3676 EDA 2018 |

Appeal from the Order Entered November 15, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0002530-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: A.I.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3678 EDA 2018 |

Appeal from the Decree Entered November 15, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000682-2018

| IN THE INTEREST OF: S.A.A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3679 EDA 2018 |

Appeal from the Decree Entered November 15, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000683-2018

BEFORE:   PANELLA, P.J., OLSON, J., and COLINS, J.*

MEMORANDUM BY PANELLA, P.J.:                     **FILED NOVEMBER 06, 2019**

T.B. ("Father") appeals from the decrees entered November 15, 2018, that granted the petitions of the Philadelphia Department of Human Services ("DHS"), and involuntarily terminated his parental rights to his sons, A.I.W. (born June 2012), and S.A.A.B. (born May 2013) (collectively, "Children").[1] Father also appeals the orders entered the same day that changed Children's permanent placement goals to adoption. After careful review, we affirm.

The trial court set forth the factual and procedural history of this matter as follows:

> On November 15, 2016, the [c]hildren became known to the Department of Human Services ("DHS") when DHS received a General Protective Services ("GPS") report alleging that there was

---

* Retired Senior Judge assigned to the Superior Court.

[1] The court also involuntarily terminated the parental rights of S.W. ("Mother"), the mother of A.I.W. and S.A.A.B. Mother appealed the decrees terminating her parental rights, and we address her appeal in a separate memorandum.

- 2 -

no food in the parental home; that the home was heated with electric space heaters; that the home had no hot water; and that Mother and Children were residing in a shelter. The report also alleged that Father was currently hospitalized recovering from a bullet wound and that there was [a] history of domestic violence between Mother and Father. On November 15, 2016, DHS visited the home and found [c]hildren A[.]W[.] and S[.]B[.] with Mother. DHS observed that the home was infested with bed bugs; the stove [was] greasy; and the basement smelled of raw sewage. Child A[.]W[.] and [c]hild S[.]B[.] lacked proper dental care and had a foul o[dor]. As a result of the home visit, DHS obtained an Order for Protective Custody ("OPC") for the [c]hildren. On November 30, 2016, following a hearing, the [c]hildren were adjudicated dependent.

On March 9, 2017, a Single Case Plan ("SCP") was created. The parental objectives for Mother were to receive mental health treatment and enroll in job counseling. The parental objectives of Father were to enroll in parenting classes and mental health treatment. On February 18, 2018, a revised SCP was created. The parental objectives for Mother were to visit the [c]hildren bi-weekly separate from Father; (2) Mother was to attend anger management classes; (3) Mother was to attend mental health treatment; (4) Mother would make the house suitable for the [c]hildren; and (5) Mother would seek employment and appropriate housing. The parental objectives for Father were (1) to visit the [c]hildren bi-weekly; (2) to attend anger management counseling; (3) to receive weekly mental health treatment and (4) to make the house suitable for the [c]hildren.

Trial Court Opinion, 5/8/19, at 2-3 (citations to the record omitted).

On August 21, 2018, DHS filed petitions to involuntarily terminate the parental rights of Mother and Father and to change Children's permanent placement goals to adoption. The court conducted hearings on the petitions on September 14, 2018 and November 15, 2018.[2]

---

[2] Children were represented by Attorney James Martin as legal counsel and Attorney Daniel Kurland as guardian *ad litem*.

DHS presented the testimony of Jasmine Mitchell, the Community Umbrella Agency ("CUA") case manager for Turning Points for Children; Majita Mohammad, a life skills and visitation coach; and Sakina Shaddiq, a visitation coach. Father testified on his own behalf. On November 15, 2018, the court entered decrees involuntarily terminating Father's parental rights to Children, and orders changing Children's permanent placement goals to adoption. On December 17, 2018, Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[3] This Court, acting *sua sponte*, consolidated Father's appeals.

On appeal, Father raises the following issues for our review:

1.      Whether the trial court's decision to involuntarily terminate T.B.'s parental rights to his children A.W. and S.B., was not supported by clear and convincing evidence warranting such determination?

2.      Whether the trial court's decision to change A.W.'s and S.B.'s permanency goal from reunification with the parent to adoption was not supported by clear and convincing evidence demonstrating that such decision would best protect the children's needs and welfare and be in the child[ren]'s best interests?

_____

[3] Generally, a party must file his or her notice of appeal within thirty days after entry of the order. *See* Pa.R.A.P. 903(a) ("Except as otherwise prescribed by this rule, the notice of appeal . . . shall be filed within 30 days after the entry of the order from which the appeal is taken."). Thirty days after November 15, 2018, was Saturday, December 15, 2018. Thus, Father timely filed his notice of appeal on Monday, December 17, 2018. *See* 1 Pa.C.S.A. § 1908 ("Whenever the last day of any such period shall fall on Saturday or Sunday, . . . such day shall be omitted from the computation.").

Father's brief at 5.

We review these claims mindful of our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), as well as (b). This Court may

affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we will focus our analysis on Section 2511(a)(2) and (b), which provides as follows:

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2) and (b).

Our Supreme Court set forth our inquiry under Section 2511(a)(2) as follows:

As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012) (citations omitted).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under Section 2511(a)(2) are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *See In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002).

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. **See id.** A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. **See id.** at 340.

Father asserts the trial court erred in terminating his parental rights pursuant to Section 2511(a)(2) because the evidence "presented at trial did not establish any substantial parental objective plan that [F]ather failed to meet to prohibit reunification." **See** Father's brief at 17. Father contends that he parented Children and has been in their lives since birth. **See id.** at 20. Father asserts DHS provided minimal assistance with housing, and that his housing was appropriate. **See id.** Further, Father argues that he obtained employment and was pursuing a Social Security Disability claim. **See id.** Accordingly, Father contends that the conditions that led to Children's placement have been substantially remedied. **See id.** at 21.

The trial court terminated Father's parental rights pursuant to Section 2511(a)(2), reasoning that Father failed to timely obtain appropriate housing, complete mental health treatment, or attend parenting classes. **See** Trial Court Opinion, 5/8/19, at 5-6. Further, the court observed that Father failed to appear for drug tests. **See id.** at 6. The court found DHS's witnesses to be credible and Father's testimony to be neither compelling nor credible. **See id.**

at 7. Accordingly, the court determined that DHS met its burden of proof with respect to Section 2511(a)(2).

The record supports the trial court's conclusion. Jasmine Mitchell, the CUA caseworker, testified that the family initially came to DHS's attention due to allegations involving the family home having a broken water heater, a lack of food and supervision, and poor hygiene. *See* N.T., 9/14/18, at 18. Children were adjudicated dependent November 30, 2016, and have been in placement since that time. *See id.* Father's SCP objectives were to attend mental health therapy; appear for drug screens; obtain appropriate housing and employment; complete a fatherhood program; attend a parenting program at the Achieving Reunification Center ("ARC"); and obtain a parenting capacity evaluation ("PCE"). *See id.* at 30-32, 34-37, 52-53. Shortly before the termination hearing, Father was able to make his housing appropriate. *See id.* at 23, 34-36, 67-68. Further, Father was consistent with his mental health therapy after April 2017. *See id.* at 30-31. Overall, Father's compliance with the SCP was moderate. *See id.* at 57.

However, Mitchell testified that Father attended the first portion of the PCE after failing to attend four appointments between October 2017 and March 2018. *See id.* at 31-32, 69-70. Father failed to appear for drug testing that would allow for the completion of the PCE. *See id.* at 31-32. Moreover, Father failed to complete the fatherhood program and the ARC program. *See id.* at

36-37, 55. Although Father asserted he worked, he claimed his work was under the table and did not provide documentation. *See id.* at 55-56.

Additionally, Father did not visit Children from November 2016 until February 2017 because he could not be contacted. *See id.* at 23-24. Once Father began visits, they were always supervised, in large part because of his lack of impulse control. *See id.* at 57.

Majita Mohammad testified regarding Father's visits with Children, noting that, from August 2017 through February 2018, Mother and Father were offered approximately twenty-five visits and attended four. *See id.* at 102-03. After February 2018, Father's attendance became more consistent. *See id.* at 108.

Father testified that he was compliant with his objectives, and that, to the extent he failed to achieve objectives, it was because DHS failed to contact him. *See id.* at 140-44. Father asserted that he never missed a visit, and that the visits went well. *See id.* at 150; N.T., 11/15/18, at 5-6.

Father contended that he earned money by performing light maintenance work for his family, and that he had applied for Social Security Disability. *See* N.T., 9/14/18, at 147-50. Father testified that he applied for disability as a result of unknown assailants shooting Father on three separate occasions. *See* N.T., 9/14/18, at 131-35; N.T., 11/15/18, at 11-12, 15. Father asserted that he lives in a four-bedroom house, and that his housing is appropriate. *See* N.T., 11/15/18, at 11. However, he acknowledged that he

was still attending anger management, never started the fatherhood program, and did not attend any ARC programs. *See id.* at 15, 17, 19-20. Father testified that he was never asked to complete a parenting class. *See id.*

As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Here, the court credited the testimony of DHS's witnesses, and the record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Children to be without essential parental control or subsistence necessary for their physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

We next consider whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(b). The requisite analysis is as follows.

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quotation marks and citations omitted).

Father argues that DHS presented insufficient evidence that termination of his parental rights was in Children's best interests, and further argues that DHS failed to present evidence regarding the negative effects that terminating his parental rights would have on Children. *See* Father's brief at 23. Accordingly, Father contends that terminating his parental rights would sever a necessary and beneficial bond. *See id.* at 24.

The trial court found that termination of Father's parental rights was in the best interests of Children pursuant to Section 2511(b). *See* Trial Court

Opinion, 5/8/19, at 4. The court emphasized Children's need for stability and continuity. *See* N.T., 11/15/18, at 33-34.

The record supports the trial court's conclusion. Mohammad testified that, during visits, Children and Father greeted each other by hugging and kissing, and Father was engaged with Children. *See* N.T., 9/14/18, at 104. However, Children did not tell Father they miss him. *See id.* Similarly, Mohammad observed that Children were excited to see Father but do not cry when he leaves and do not suggest they want to leave with Father. *See id.* at 121-22. Moreover, counsel for Children indicated that Children are happy living with their paternal grandmother, and did not indicate they wanted to return to Father. *See* N.T., 11/15/18, at 27.

In contrast, Father testified that he raised Children since birth, Children refer to him as "dad," and Children want to return home. *See* N.T., 11/15/18, at 12-14. Father further testified that he wants to be reunited with Children and shares a bond with them. *See id.*

The credited testimony supports the trial court's decision that it would best serve the needs and welfare of Children to involuntarily terminate Father's parental rights pursuant to Section 2511(b). Preserving Father's parental rights would serve only to deny Children the permanence and stability to which they are entitled. *See In re Adoption of C.D.R.*, 111 A.3d at 1220 ("Clearly, it would not be in [the child's] best interest for his life to remain on hold indefinitely in hopes that [Father] will one day be able to act as his

parent."). Accordingly, the trial court did not err in terminating Father's parental rights to Children pursuant to Section 2511(b).

In his final issue, Father argues the trial court erred in changing Children's permanent placement goals to adoption because the court failed to give primary consideration to the physical and emotional needs and welfare of Children. **See** Father's brief at 17, 25. Father also argues that he substantially remedied the conditions that led to Children's placement and maintains a bond with Children. **See id.** at 21-22.

The Juvenile Act governs proceedings to change a child's permanent placement goal. **See** 42 Pa.C.S.A. §§ 6301-6375. Trial courts must apply the following analysis:

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

**In re A.B.**, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted). We review the court's ruling to ensure it is supported by

evidence of record and to determine if it constitutes an abuse of the court's discretion. ***See In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010).

Although the trial court did not specifically address this issue in its opinion, our review of the record supports the trial court's orders changing Children's permanent placement goals to adoption. At the time of the proceedings, Children had been in foster care for nearly two years. Father failed to demonstrate an ability to parent Children during their time in care. Accordingly, it is clear that Father will not be in a position to provide Children with a safe and permanent home at any point in the foreseeable future. Therefore, we discern no abuse of discretion by the court in changing Children's permanent placement goals from reunification to adoption.

Accordingly, we affirm the decrees involuntarily terminating Father's parental rights, and the orders changing Children's permanent placement goals to adoption.

Decrees affirmed; Orders affirmed.
Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/6/19